## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KAREN ARTHUR, | ) |
| **Plaintiff,** | ) |
| | )  **CIVIL ACTION** |
| v. | )  **Case. No. _____** |
| | ) |
| | )  **JURY TRIAL DEMANDED** |
| BOSTON SCIENTIFIC CORPORATION | ) |
| | ) |
| **Defendant.** | ) |

### COMPLAINT AND JURY DEMAND

Plaintiff, Karen Arthur, by and through her attorneys of record, and for her causes of action against Defendant Boston Scientific Corporation states and alleges as follows:

### INTRODUCTION

1. On July 22, 2022, Plaintiff was surgically implanted with an Advantage Fit Blue Transvaginal Mid-Urethral Sling ("Advantage"), a pelvic mesh product and medical device designed, manufactured, and marketed by Defendant to treat stress urinary incontinence ("SUI").

2. Defendants failed to warn both Plaintiff and her healthcare providers that the Advantage was defective and negligently designed, marketed, tested, and manufactured. Plaintiff has suffered, and continues to suffer serious and permanent injuries as result of Defendant's unreasonably dangerous and defective Advantage product. Plaintiff brings this suit for damages related to those injuries.

1

## PARTIES

3.  At all times relevant to this action, Plaintiff was a citizen and resident of Ringold, Georgia, Catoosa County.

4.  Defendant Boston Scientific Corporation ("Boston Scientific") is a corporation organized and existing under the laws of Delaware. It maintains its principle place of business and corporate headquarters at 300 Boston Scientific Way, Marlborough, MA 01752.

5.  The registered Agent of Boston Scientific is Timothy A. Pratt, One Boston Scientific Place, Natick, MA 01760.

## VENUE AND JURISDICTION

6.  This Court has subject matter jurisdiction over the parties pursuant to 28 U.S.C. § 1332(a) because the parties are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

7.  Venue for this action lies in this Court because the Defendant resides in this District and the wrongful acts upon which this lawsuit is based in part occurred in this District. Venue is also proper pursuant to 28 U.S.C. § 1391(c) because Defendant has substantial, systematic, and continuous contacts in this District, and it is subject to personal jurisdiction in this District.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

8.  This is an action to recover damages for personal injuries suffered by Plaintiff because of the implantation of the Advantage pelvic mesh medical device, as tested, studied, researched, evaluated, endorsed, designed, formulated, compounded, manufactured, produced, assembled,

inspected, distributed, marketed, labeled, promoted, packaged, advertised for sale, prescribed, sold or otherwise placed in the stream of commerce by Defendant.

9. At all relevant times, Defendant's officers and directors participated in and authorized and directed the production and promotion of the Advantage when they knew, or with the exercise of reasonable care should have known, of the hazards and dangerous propensities of Advantage and thereby actively participated in the tortious conduct which resulted in Plaintiff's injuries.

10. At all relevant times, Defendants were in the business of developing, licensing, manufacturing, distributing, selling, marketing, advertising, and delivering, and introducing into interstate commerce, including, inter alia, within the United States, either directly or indirectly through third parties, subsidiaries or related entities, pelvic mesh products that included the Advantage device implanted in Plaintiff.

11. At all relevant times, Defendant's pelvic mesh products were used to treat pelvic organ prolapse and/or SUI.

12. A pelvic organ prolapse occurs when a pelvic organ, such as the bladder, drops from its normal position and pushes against the walls of the vagina.

13. SUI is a type of incontinence characterized by leakage of urine during moments of physical stress. At all relevant times, the Advantage was approved for an indicated to treat SUI.

14. The FDA cleared the first pelvic mesh products for use in the treatment of SUI in 1996. These products include products manufactured, marketed, and distributed by Defendant. These products were and are approved by the FDA under the abbreviated 510(k) approval process of the Food, Drug and Cosmetic Act. Section 510(k) allows for the marketing and distribution of a medical device if the device is deemed "substantially equivalent" to other predicate devices that

were approved before May 28, 1976. This clearance process does not require the applicant to prove the safety or efficacy of the device.

15. These products include those known as Uphold Vaginal Support System, Pinnacle Floor Repair Kit, Advantage Transvaginal Mid-Urethral Sling System, Advantage Fit System, Lynx Suprapubic Mid-Urethral Sling System, Obtryx Transobturator Mid-Urethral Sling Systems (I and II), Prefyx PPS System, Solyx SIS System, as well as any variations of these products and any unnamed Boston Scientific pelvic mesh product designed and sold for similar purposes, inclusive of the instruments and procedures for implementation.

16. The products include Y-shaped meshes, which are vaginal mesh products that were more recently designed and marketed by Defendant. One such product is the Boston Scientific Upsylon Y Mesh. Y-shaped mesh is inserted abdominally to support pelvic organs.

17. All of these products are collectively referenced as Defendant's "Pelvic Mesh Products" or "Products." Any reference herein to "Pelvic Mesh Products" or "Products" should also be interpreted as a reference specifically to the Advantage.

### *History of Defendant's Pelvic Mesh Products*

18. At all relevant times, Defendant was in the business of developing, designing, licensing, manufacturing, distributing, selling, marketing, advertising, and delivering, and introducing into interstate commerce, including, inter alia, within the United States, either directly or indirectly through third parties, subsidiaries or related entities, Pelvic Mesh Products.

19. At all relevant times, Pelvic Mesh Products were used to treat pelvic organ prolapse and stress urinary incontinence.

20. A pelvic organ prolapse occurs when a pelvic organ, such as the bladder, drops ("prolapses") from its normal position and pushes against the walls of the vagina. Prolapse can happen if the muscles that hold the pelvic organs in place become weak or stretched from aging, weight gain, childbirth or any surgery. More than one pelvic organ can prolapse at the same time. Organs that can be involved in a pelvic organ prolapse include the bladder, uterus, bowel, and the rectum.

21. Stress urinary incontinence is a type of incontinence characterized by leakage of urine during moments of physical stress, like coughing, sneezing, or exercise.

22. Surgical mesh, including the mesh used in Defendant's Pelvic Mesh Products, is a medical device that is generally used to repair weakened or damaged tissue. The mesh is made from porous absorbable or non-absorbable synthetic material or absorbable biologic material. In urogynecologic procedures, surgical mesh is permanently implanted to reinforce the weakened vaginal wall to repair pelvic organ prolapse or to support the urethra to treat SUI. Many of Defendants' pelvic mesh products, including the Advantage at issue in this case, are comprised of non-absorbable, synthetic, monofilament polypropylene mesh.

23. Moreover, despite claims that polypropylene mesh is inert, the scientific evidence shows that this material as implanted in Plaintiff is biologically incompatible with human tissue and when used as a woven or knitted alloplastic textile prosthetic mesh for pelvic floor repair, polypropylene and other surgical polymers promote a severe foreign body reaction and chronic inflammatory response in a large subset of the population implanted with Defendants' pelvic mesh products, including the Advantage product at issue in this case. This "host defense response" by a woman's pelvic tissues promotes degradation of the polypropylene mesh and the pelvic tissue, causes

chronic inflammation of the pelvic tissue, causes shrinkage or contraction of the mesh leading to nerve entrapment, further inflammation, chronic infectious response and chronic pain, cause new-onset painful sexual relations, significant urinary dysfunction, vaginal shortening and anatomic deformation, and can contribute to the formation of severe adverse reactions to the mesh.

24. Furthermore, Defendant's Pelvic Mesh Products cause hyper-inflammatory responses leading to problems including chronic pain and fibrotic reaction. The Pelvic Mesh Products cause adverse tissue reactions, and are causally related to infection, as collagen is a foreign organic material. Mesh is harsh upon the female pelvic tissues. It hardens in the body and becomes inflexible, as does the scar tissue surrounding it.

25. When these Pelvic Mesh Products are inserted in the female body according to the manufacturers' instructions, it creates a non-anatomic condition in the pelvis leading to chronic pain and functional disabilities.

26. On July 13, 2011, FDA issued a new warning regarding serious complications associated with pelvic mesh products, such as the pelvic mesh products manufactured, marketed, and distributed by Defendants. In this warning, FDA indicated that "serious complications associated with surgical mesh for transvaginal repair of POP are **not rare**." (emphasis in the original). FDA had also received increased reports of complications associated with the pelvic mesh products used in both pelvic organ prolapse and SUI cases.

27. The FDA Safety Communication also stated, "*Mesh contraction* (shrinkage) is a *previously unidentified risk of* transvaginal POP repair with mesh that has been reported in the published literature and in adverse event reports to the FDA…Reports in the literature associate mesh contraction with vaginal shortening, vaginal tightening and vaginal pain." (emphasis in original).

28. Contemporaneously with the Safety Communication, the FDA released a publication titled "Urogynecologic Surgical Mesh: Update on the Safety and Effectiveness of Transvaginal Placement for Pelvic Organ Prolapse" (the White Paper). In the White Paper, the FDA noted that published, peer-reviewed literature demonstrates that "[p]atients who undergo POP repair with mesh are subject to mesh-related complications that are not experienced by patients who undergo traditional surgery without mesh."

29. The FDA summarized its findings from its review of the adverse event reports and applicable literature stating that it "has NOT seen conclusive evidence that using transvaginally placed mesh in POP repair improves clinical outcomes any more than traditional POP repair that does not use mesh, and it may expose patients to greater risks."

30. The White Paper further stated that "these products are associated with serious adverse events…Compounding the concerns regarding adverse events are performance data that fail to demonstrate improved clinical benefit over traditional non-mesh repair." In its White Paper, the FDA advises doctors to, inter alia, "[r]ecognize that in most cases POP can be treated successfully without mesh thus avoiding the risk of mesh related complications." The White Paper concludes by stating that the FDA "has identified serious safety and effectiveness concerns over the use of surgical mesh for the transvaginal repair of pelvic organ prolapse."

31. On August 25, 2011, Public Citizen, a consumer advocacy group, submitted a petition to FDA seeking to ban the use of pelvic mesh products in pelvic repair procedures. In its Petition, Public Citizen warned that pelvic mesh products should be recalled because they offer no significant benefits but expose patients to serious risks and the potential for permanent life-altering harm.

7

32. In a December 2011 Joint Committee Opinion, the American College of Obstetricians and Gynecologists ("ACOG") and the American Urogynecologic Society ("AUGS") also identified physical and mechanical changes to the transvaginal mesh inside the body as a serious complication associated with transvaginal mesh, stating:

> **There are increasing reports of vaginal pain associated with changes that can occur with mesh (contraction, retraction, or shrinkage) that result in taut section of mesh…Some of these women will require surgical intervention to correct the condition, and some of the pain appears to be intractable.**

33. The ACOG/AUGS Joint Committee Opinion also recommended, among other things, that "[p]elvic organ prolapse vaginal mesh repair should be reserved for high-risk individuals in whom the benefit of mesh placement may justify the risk."

34. As is known to the Defendants, the risks associated with pelvic organ prolapse repair are the same as SUI repair.

35. In September 2011, FDA acknowledged the need for additional data and noted in "Surgical Mesh For Treatment of Women with Pelvic Organ Prolapse and Stress Urinary Incontinence" that the literature and information developing on SUI repair with pelvic mesh products "indicates that serious complications can occur…[and] a case can be made for additional premarket and/or post market studies to better address the risk/benefit of all mesh products used for SUI."

36. Defendant never adequately studied the extent of risks associated with the SUI repair Pelvic Mesh Products. In January 2012, The FDA recognized the risk to women and mandated additional studies to further investigate these risks associated with the Products used to repair SUI.

37. Defendant knew or should have known that its pelvic mesh products, including the Advantage device at issue in this case, unreasonably exposed patients to the risk of serious harm while conferring no benefit over available feasible alternatives that do not involve the same risks.

8

At the time that Defendant began marketing the Advantage device, Defendants were aware that the Advantage was associated with each and every one of the adverse events communicated by FDA in its July 13, 2011, safety communication.

38. Defendant knew or should have known that its Pelvic Mesh Products unreasonably exposed patients to the risk of serious harm while conferring no benefit over available feasible alternatives that do not involve the same risks.

39. At the time Defendant began marketing its Pelvic Mesh Products, Defendant was aware that its Pelvic Mesh Products were associated with all of the adverse events communicated by the FDA in its July 13, 2011, safety communication.

40. Despite claims that polypropylene mesh is inert, the scientific evidence shows that this material, as implanted in Plaintiff and set forth below, is biologically incompatible with human tissue.

41. When used as a woven or knitted alloplastic textile prosthetic mesh for pelvic floor repair, polypropylene and other surgical polymers promote a severe foreign body reaction and chronic inflammatory response in a large subset of the population implanted with Defendant's Pelvic Mesh Products. This "host defense response" by a woman's pelvic tissues causes chronic inflammation of the pelvic tissue, caused shrinkage or contraction of the mesh leading to nerve entrapment, further inflammation, chronic infectious response and chronic pain, cause new-onset painful sexual relations, significant urinary dysfunction, vaginal shortening and anatomic deformation, scarring, and can contribute to the formation of severe adverse reactions to the polypropylene mesh.

42. Complications from mesh placement for pelvic organ prolapse include among other events: acute and chronic infection, tissue contraction due to mesh shrinkage, erosion of the mesh into

9

adjacent structures, and dyspareunia. 15. Cosson, M., et al., *Mechanical properties of synthetic implants used in the repair of prolapse and urinary incontinence in women: which is the ideal material?* Int Urogynecol J. Pelvic Floor Dysfunct, 2003. 14(3): p. 169-78; discussion 178. Jones, K.A., et al., *Tensile properties of commonly used prolapse meshes*. Int Urogynecol J Pelvic Floor Dysfunct, 2009. 20(7): p. 847-53. Margulies, R.U., et al., *Complications requiring reoperation following vaginal mesh kit procedures for prolapse* Am J Obstet Gynecol, 2008. 199(6): p. 678 e1-4.

43. Defendants Pelvic Mesh Products were unreasonably susceptible to degradation and fragmentation inside the body; shrinkage or contraction inside the body; intense foreign body reaction; chronic inflammatory response; chronic wound healing; chronic infections in and around the mesh fibers; and nerve entrapment in the collagen scar formation. Defendants knew or should have known of these serious risks and should have, therefore, warned physicians and patients regarding these risks.

44. Defendants omitted and downplayed the risks, dangers, defects, and disadvantages of the Advantage, and advertised, promoted, marketed, sold and distributed the Advantage as a safe medical device when Defendants knew or should have known that the Advantage was not safe for its intended purpose, and that the Advantage would cause, and did cause, serious medical problems, and in some patients, include Plaintiff, catastrophic injuries.

45. To this day, Defendants continue to market the Advantage device to the medical community and to patients as safe, effective and reliable, implanted by safe, effective and minimally invasive surgical techniques, and as safer and more effective as compared to feasible alternative treatments of and competing products for SUI.

46. Contrary to Defendants' representations and marketing to the medical community and to patients, the Advantage device has a high rate of failure, injury, and complications, fails to perform as intended, requires frequent and often debilitating re-operations, and has caused severe and irreversible injuries, conditions, and damage to a significant number of women, including Plaintiff.

47. The specific nature of the Advantage's defects includes, but is not limited to, the following:

a. The use of polypropylene in the Advantage and the adverse tissue reactions and host defense response that result from such material, causing adverse reactions and serious, permanent injuries, including, but not limited to, painful recurrent erosions and associated intractable pain;

b. The design of the Advantage is to be inserted into and through an area of the body that is blood vessel rich, nerve dense, and bacteria laden leading to excessive blood loss and vascular damage, permanent never injury and associated, chronic intractable neuropathic pain, contaminated permanently-implanted mesh causing chronic infections, subclinical infections and biofilms, enhanced chronic inflammatory response, chronic wound healing with tissue destruction, as well as numerous other adverse reactions and serious and permanent injuries;

c. Biomechanical issues with the design of the Advantage which results in a non-anatomic condition leading to contraction or shrinkage of the mesh inside the body, that in turn causes surrounding tissue to become eroded, inflamed, fibrotic and infected, resulting in serious and permanent injury;

11

d.  The propensity of the mesh design characteristics of the Advantage for plastic deformation when subjected to tension both during implantation and once implanted inside the body which causes the mesh, or portions thereof, to be encapsulated in a rigid scar plate which leads to nerve entrapment, bacterial entrapment, tissue destruction, enhanced inflammatory and fibrotic response and chronic pain;

e.  The propensity of the Advantage to become rigid and inflexible, causing it to be improperly mated to the delicate and sensitive areas of the vagina and pelvis where it is implanted, and causing discomfort and pain with normal daily activities that involve movement in the pelvic region (e.g., intercourse, defection, walking);

f.  The propensity for the Advantage to degrade or fragment over time, which causes an increased surface area that leads to enhanced chronic inflammatory and fibrotic reaction, causing a "barbed wire" or "saw blade" effect by the fragmented surface "sawing" through the tissue, leads to bacteria harboring in the fragmented, peeled and split fiber surface which in turn leads to chronic infections at the mesh surface, and results in continuing injury over time; and

g.  The hyper-inflammatory responses to collagen leading to problems including chronic inflammatory response, chronic pain and fibrotic reaction as well as infections and other serious adverse events;

h.  The inability of surgeons to effectively treat many of these conditions due to the integration of the mesh into the pelvic tissue and thus the inability to safely remove or excise the mesh once a complication occurs.

48. The Advantage is also defective due to Defendants' failure to adequately warn or instruct Plaintiff or her healthcare providers of subjects, including but not limited to, the following:

a.  The Advantage's propensity to contract, retract, and/or shrink inside the body;

b.  The Advantage's propensity for degradation, fragmentation, and/or migration.

c.  The Advantage' inelasticity preventing proper mating with the pelvic floor and vaginal region;

d.  The frequency and manner of mesh erosion or extrusion;

e.  The risk of chronic inflammation resulting from the Advantage;

f.  The risk of chronic infections resulting from the Advantage;

g.  The risk of permanent vaginal or pelvic scarring resulting from the Advantage;

h.  The risk of de novo urinary dysfunction;

i.  The risk of de novo dyspareunia or painful sexual relations;

j.  The risk of recurrence, intractable pelvic pain and other pain resulting from the Advantage;

k.  The need for correct or revision surgery to adjust or remove the Advantage which in some cases is not feasible nor possible;

l.  The severity of complications that could Advantage as a result of the implantation of the Advantage;

13

m.  Treatment of SUI with Advantage is no more effective than feasible, available safer alternatives;

n.  Treatment of SUI with the Advantage exposes patients to greater risks than feasible, available and safer alternatives;

o.  Treatment of SUI with the Advantage makes future surgical repair more difficult than feasible, available and safer alternatives;

p.  Use of the Advantage puts the patient at greater risk of requiring additional surgery than feasible, available and safer alternatives;

q.  Complete removal of the Advantage may not be possible and may not result in complete resolution of the complications, including pain and SUI.

49. Defendants committed and downplayed the risks, dangers, defects, and disadvantages of the Advantage device, and advertised, promoted, marketed, sold and distributed the Advantage device as a safe medical device with high success and low complications. Defendants knew or should have known that the Advantage device was not safe for its intended and marketed purpose, and that it would cause, and did cause, serious medical problems in patients, and in Plaintiff, catastrophic injuries. Defendants never communicated the seriousness or frequency of these known complications to doctors.

50. Defendants paid millions of dollars to consultant surgeons for them to adopt the Advantage device into their practices and to recommend the device to other surgeons. These so called "seeding trials" are a form of marketing, but the marketing is conducted in the name of research.

51. Defendants paid millions of dollars to consultant surgeons to have access and control over data that would be published on the safety of the devices used by their consultant surgeons.

14

52. Defendants paid millions of dollars to consultants to help market products, including Advantage, while downplaying the risks of those products.

53. Defendants paid millions of dollars to consultants and lobbying groups to make misrepresentations on Defendants' behalf to healthcare providers, safety organizations, and the public and to improperly influence articles, research, and coverage related to Defendants' devices, including the Advantage device.

54. Defendants did not tell Plaintiff, her healthcare providers, or the medical community that the consultant surgeons were receiving millions of dollars from Defendants in exchange for the consultants' work.

55. Defendants failed to perform proper and adequate testing and research to determine and evaluate the nature, magnitude, and frequency of the risks of the Advantage device.

56. Defendants never established a safe and effective procedure for removal of the Advantage, and never determined whether the Advantage could be safely removed.

57. Defendants knowingly provided incomplete information and insufficient training and information to physicians regarding the use of the Advantage and the aftercare and treatment of patients implanted with an Advantage device.

58. Defendants failed to provide warnings and instructions with the Advantage device that would have put Plaintiff, her healthcare providers, and the general public on notice as to the true dangers and risks of the Advantage device.

59. Defendant underreported and continues to underreport information about the propensity of the Products to fail and cause injury and complications, and has made unfounded representations regarding the efficacy and safety of the Products through various means and media.

60. The injuries, conditions, and complications suffered by numerous women around the world who have been implanted with the Products include, but are not limited to, erosion, mesh contraction, infection, fistula, inflammation, scar tissue, organ perforation, dyspareunia, blood loss, neuropathic and other acute and chronic nerve damage and pain, pudendal nerve damage, pelvic floor damage, chronic pelvic pain, emotional distress and mental anguish, and other debilitating complications. In addition, women who have suffered injuries like these, including Plaintiff, will need to be continuously monitored as a result of being implanted with Defendant's Products.

61. A monitoring procedure exists for individuals experiencing physical and mental injuries from mesh implanted in patients with pelvic organ prolapsed and/or stress urinary incontinence. The monitoring procedure has been prescribed by a qualified physician and is reasonably necessary according to contemporary scientific principles. As such, Plaintiff is entitled to future medical monitoring and treatment directly related to the existing injuries caused by the defective products.

62. In many cases, including Plaintiff's, women have been forced to undergo extensive medical treatment, including, but not limited to, operations to locate and remove mesh, operations to attempt to repair pelvic organs, tissue, and nerve damage, the use of pain control and other medications, injections into various areas of the pelvis, spine, and the vagina, and operations to remove portions of the female genitalia.

63. As a result of these life-altering and, in some cases, permanent injuries, Plaintiff has suffered severe emotional pain and injury and has suffered and will continue to suffer apprehension of increased risk for injuries, infections, pain, mental anguish, discharge, and multiple corrective surgeries as result of implantation of the Pelvic Mesh Products.

64. The medical and scientific literature studying the effects of Defendants Pelvic Mesh Products, such as the effects of the Advantage implanted in Plaintiff, has examined each of these injuries, conditions, and complications, and has reported that they are causally related to the Products.

65. Removal of contracted, eroded, and/or infected transvaginal mesh can require multiple surgical interventions for removal of mesh and results in scarring on fragile compromised pelvic tissue and muscles.

### Plaintiff's Advantage Surgeries

66. On July 22, 2022, Plaintiff was implanted with a Advantage Fit Blue Transvaginal Mid-Urethral Sling, lot number 29422181, at Baroness Erlanger Hospital in Chattanooga, Tennessee by Dr. Kent Childs. Defendants designed, manufactured, packaged, labeled, and sold the Advantage device that was implanted in Plaintiff.

67. Dr. Kent Childs implanted Plaintiff's Advantage device to treat Plaintiff for SUI, the use for which Defendants marketed the Advantage device. The Advantage implanted in Plaintiff was in the same or substantially similar condition as it was when it left Defendants' possession, and in the condition directed by and expected by Defendants. Dr. Kent Childs implanted the Advantage device properly and in accordance with Defendant's instructions.

68. Although the Advantage was intended to treat SUI, neither Plaintiff nor her healthcare providers were warned that the Advantage was defective and negligently designed and marketed.

69. Plaintiff underwent a procedure to revise and remove a portion of the eroded Advantage device on January 7, 2025, at Baroness Erlanger Hospital in Chattanooga, Tennessee. Dr. Henry Okafor performed the procedure. Dr. Okafor observed that the Advantage had eroded and removed

17

it. Dr. Okafor had to perform a cystourethroplasy, partial excision of synthetic sling mesh, and anterior colporrhaphy secondary to the Advantage.

70. Plaintiff has suffered and continues to suffer serious and permanent injuries, including pelvic, groin, and vaginal pain, erosion of the Advantage, failure of the Advantage to treat her SUI, worsening of her SUI, and the need for multiple painful surgeries to revise and remove the eroded Advantage device. She will require future medical care and treatment for the permanent injuries caused by the Advantage device. Her future prognosis is unknown. She has also incurred significant financial expenses for her related medical treatment, and she will continue to incur expenses as her treatment continues.

## COUNT I: NEGLIGENCE – DESIGN

*(Tennessee Products Liability Act ("TPLA"), Tenn. Code Ann. §§ 29-28-101, et seq.; Tenn. Code Ann. § 29-28-105.)*

71. Plaintiff incorporates each and every paragraph of this Complaint by reference as if fully stated herein.

72. At all relevant times, Defendant was engaged in the business of designing, manufacturing, labeling, and distributing, supplying, and/or selling its pelvic mesh products, including the Advantage device implanted into Plaintiff.

73. Defendant owed to Plaintiff and the public a duty to act reasonably and to exercise ordinary care in designing the Advantage device.  For the reasons set forth above, Defendant has breached said duty of care in that Defendant failed to use the amount of care in the designing the Advantage that a reasonably careful product designer would have used in similar circumstances to avoid

18

exposing others to a foreseeable risk of harm. Defendant's violations of the duties of ordinary care and skill owed by Defendant to Plaintiff include but are not necessarily limited to the following:

a. Designing a product (the Advantage) which, at the time conveyed, was not in conformity with the generally recognized state of the art applicable to the safety of the product at the time the product was designed, manufactured, packaged, labeled and/or sold;

b. Designing the Advantage to be inserted into and through an area of the body that is blood vessel rich, nerve dense, and bacteria laden leading to excessive blood loss and vascular damage, permanent nerve injury and associated chronic, intractable neuropathic pain, contaminated permanently-implanted mesh causing chronic infections, subclinical infections and biofilms, enhanced chronic inflammatory response, chronic wound healing with tissue destruction, as well as numerous other adverse reactions and serious and permanent injuries without producing any additional therapeutic benefit when compared to other surgical treatment options for SUI;

c. Designing the Advantage to be inserted into and through the obturator internus muscles in the groin, when doing so produces a foreseeable risk of acute and chronic myofascial pain;

d. Designing the Advantage to be inserted into and through the obturator internus muscles in the groin, when doing so produces a foreseeable risk of obturator neuralgia and pudendal neuralgia (by aggravating the pudendal nerve as it runs through Alcock's canal) and when other available alternatives, including

retropubic slings manufactured by Defendant and other manufacturers at the time of Plaintiff's Advantage implant surgery, did not pose this risk

e. Designing the Advantage to be inserted into and through an area of the body with high levels of bacteria that can adhere to the mesh, causing immune reactions and subsequent tissue breakdown and adverse reactions and injuries without producing any additional therapeutic benefit when compared to other surgical treatment options for SUI;

f. Designing a product (Advantage) which creates a non-anatomic condition in the pelvis, leading to chronic pain and functional disabilities when the mesh is implanted according to the manufacturers' instructions that are unique to polypropylene without providing any additional therapeutic benefit when compared to other non-polypropylene surgical treatment options for SUI;

g. Designing the Advantage in such a way that complete removal of the device may be impossible or impossible without multiple surgeries and/or substantial injury to the patient, despite knowledge that in some patients, complete removal might be medically necessary to address their symptoms;

h. Using polypropylene mesh in the design of the Advantage when it was known that the use of polypropylene in the Advantage and the foreseeable adverse tissue reactions, host defense response, and immune reactions that result from such material would lead to ongoing degradation of the mesh, shrinkage, and perpetual scarification as the mesh degrades, all of which have potential to produce adverse reactions and permanent injuries including but not limited to

20

painful recurrent erosions, direct muscle and soft tissue injury, nerve entrapment or irritation of adjacent nerves, and associated intractable neuropathic pain and myofascial pain;

i. Using polypropylene mesh in the design of the Advantage when it was known that the mesh had a propensity to contract or shrink inside the body, that in turn causes surrounding tissue to be inflamed, become fibrotic, and contract, resulting in serious and permanent injury to the soft tissues and muscles of the pelvic floor without producing any additional therapeutic benefit when compared to other surgical treatment options for SUI;

j. Using polypropylene mesh in the design of the Advantage when it was known that the mesh had a propensity to "creep," or to gradually elongate and deform when subject to prolonged tension inside the body;

k. Using polypropylene mesh in the design of the Advantage when it was known that the inelasticity of the mesh caused the products to be improperly mated to the delicate and sensitive areas of the vagina and pelvis where they are implanted, and causing pain upon normal daily activities that involve movement in the pelvic region (e.g. intercourse, defecation, or walking) without providing any additional therapeutic benefit when compared to other surgical treatment options for SUI;

l. Using a polypropylene mesh weight and pore size in the Advantage that prevented safe and healthy incorporation of native tissues into mesh fabric, which could lead to fibrotic bridging and encapsulation of the tissues;

21

m.  Using polypropylene mesh in the design of the Advantage when it was known that the mesh had a propensity to degrade, disintegrate, and fragment over time, which causes a chronic inflammatory and fibrotic reaction, and results in continuing injury over time;

n.  Using polypropylene mesh in the design of the Advantage when it was known that the mesh could produce hyper-inflammatory responses to collagen leading to problems including chronic pain and fibrotic reaction; and

o.  Using polypropylene mesh in the design of the Advantage when it was known that the mesh could stiffen and harden inside the body, producing pain and damage to surrounding tissues and organs.

74. At all relevant times, safer alternative designs to the Advantage existed and in reasonable probability would have prevented or significantly reduced the risk of Plaintiff's injuries without substantially impairing the product's utility. Said safer alternative designs were economically and technologically feasible at the time the Advantage product left the control of Defendant by the application of existing or reasonably achievable scientific knowledge. Such safer alternatives designs include, but are not limited to: (1) traditional abdominal surgery using sutures to attach the urethra to a ligament in the pelvis (known as the "Burch procedure"); (2) autologous fascia sling; (3) an allograft sling such as Repliform; (4) a retropubic sling; (5) a retropubic mini-sling, such as the TFS device made by TFS Surgical; (6) a sling with less polypropylene, such as Ultrapro; (7) a sling with lighter-weight, larger pore mesh, such as that used in the Ethicon Prolift+M; (8) a sling with a polymer-based polypropylene alternative, such as PVDF; and (9) a retropubic mini-sling comprised of the materials listed in (6)-(8).

22

75. Plaintiff and/or her implanting physician used and was implanted with Defendant's Advantage in a manner that was reasonably foreseeable. Plaintiff believed the Advantage would address her stress urinary incontinence, and did not know—nor did she have any reason to know, based upon the information provided to her and provided to her implanting physician regarding the risks of the Advantage, that she would sustain the injuries from the Advantage described herein.

76. As a direct and proximate result of these design flaws and Defendant's failure to use the amount of care in the designing the Advantage that a reasonably careful product designer would have used in similar circumstances to avoid exposing others to a foreseeable risk of harm, Plaintiff has suffered and in all reasonable probability will continue to suffer from dyspareunia, pelvic pain, vaginal pain, pudendal neuralgia, recurring urinary tract infections, depression, and anxiety, as well as other symptoms and damages, including severe and permanent pain, suffering, disability, impairment of mobility, impairment of sexual function, impairment of bowel and bladder function, future surgical removal of the mesh, loss of enjoyment of life, and economic damages.

**WHEREFORE,** Plaintiff prays for judgment in her favor and against the Defendants for an amount in excess of $75,000 plus costs of suit and any further relief the Court deems equitable and just.

## COUNT II: NEGLIGENCE – MARKETING AND FAILURE TO WARN

*(TPLA, Tenn. Code Ann. §§ 29-28-101, et seq., including Tenn. Code Ann. § 29-28-102(6); Tenn. Code Ann. § 29-28-105.)*

77. Plaintiff incorporates each and every paragraph of this Complaint by reference as if fully stated herein.

78. At all times herein mentioned, Defendant was engaged in the business of marketing, supplying, and/or selling, the Advantage, including the Advantage implanted into Plaintiff.

79. At all relevant times, Defendant owed a duty to Plaintiff and the public to act reasonably and to exercise ordinary care with respect to the marketing of the Advantage, and to adequately warn of the risk and dangers of the Advantage.

80. Defendant owed to Plaintiff, and Plaintiff's physicians, and the public, a duty if and when warning about its products, including the Advantage, to provide accurate, reliable, and completely truthful information regarding the safety and any dangerous propensities of the Advantage and to provide accurate, reliable, and completely truthful information that the Advantage was unreasonably dangerous, taking into account the risks and benefits of the Advantage.

81. Defendant had a further duty to Plaintiff and foreseeable users of the Advantage to provide adequate and sufficient instructions concerning the proper use of the Advantage, as well as warnings of the risks and dangers associated with using the Advantage, including but not limited to implanting and removing the Advantage and treating patients with complications and adverse events associated with the Advantage.

82. At all relevant times, Defendant breached the aforementioned duties in that Defendant negligently and carelessly failed to adequately warn regarding the risks of the Advantage. Defendant's negligent acts and omissions include but are not limited to the following:

    a.  Failing to properly and adequately warn and instruct Plaintiff and her healthcare providers of the design defects, risks and potential complications associated with the Advantage device;

24

b.  Failing to properly and adequately warn and instruct Plaintiff and her healthcare providers as to the proper candidates for the implantation and use of the Advantage device;

c.  Failing to properly and adequately warn and instruct Plaintiff and her healthcare providers as to the safest and most effective methods of, implantation and use of the Advantage device;

d.  Failing to properly and adequately warn and instruct Plaintiff and her healthcare providers with regard to the inadequate research and testing of the Advantage device.

e.  The Advantage is a prescription medical device and was marketed, labeled, and supplied for use only by physicians and other healthcare providers. Defendant's duty to warn and instruct therefore includes a duty to provide adequate warnings and instructions to the implanting physician and other healthcare providers who act as learned intermediaries.

f.  Had Defendant provided adequate and complete warnings and instructions regarding the nature, magnitude, and frequency of the risks and potential complications associated with the Advantage, Plaintiff's implanting physician would not have recommended or implanted the Advantage, would have selected a feasible alternative treatment or design, and/or would have materially altered the procedure and post-operative management so as to avoid or substantially reduce Plaintiff's injuries.

25

83. The above acts of Defendant constitute violations of the duty of ordinary care and skill owed by Defendant to Plaintiff.

84. Plaintiff and/or her implanting physician used and was implanted with Defendant's Advantage in a manner that was reasonably foreseeable.

85. As the direct and proximate result of Defendant's negligent breach of its aforementioned duties with respect to the Advantage, Plaintiff suffered the injuries and damages alleged in this Complaint. Specifically, Plaintiff has suffered and in all reasonable probability will continue to suffer from dyspareunia, pelvic pain, groin pain, vaginal pain, pudendal neuralgia, and recurring urinary tract infections, depression, and anxiety, as well as other symptoms and damages, including severe and permanent pain, suffering, disability, impairment of mobility, impairment of sexual function, impairment of bowel and bladder function, subsequent surgical removal of the mesh, loss of enjoyment of life, and economic damages.

**WHEREFORE,** Plaintiff prays for judgment in her favor and against the Defendants for an amount in excess of $75,000 plus costs of suit and any further relief the Court deems equitable and just.

## COUNT III: STRICT LIABILITY – DESIGN DEFECT

*(TPLA, Tenn. Code Ann. §§ 29-28-101, et seq., including Tenn. Code Ann. §§ 29-28-102(8) and 29-28-105.)*

86. Plaintiff incorporates each and every paragraph of this Complaint by reference as if fully stated herein.

26

87. At all relevant times, Defendant designed, researched, developed, manufactured, tested, labeled, advertised, promoted, marketed, sold and distributed the Advantage product that was implanted into Plaintiff.

88. Defendant's Advantage product was expected to, and did, reach the intended consumers, handlers, and persons coming into contact with Defendant's Pelvic Mesh Products without substantial change in the condition in which it was produced, manufactured, sold, distributed, labeled, and marketed by Defendant.

89. At all relevant times, Defendant's Advantage product was manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous condition, which was dangerous for use by the public, and in particular, by Plaintiff.

90. Defendant's Advantage product was defective in design and formulation in that, when it left Defendant's hands, the foreseeable risks exceeded the benefits allegedly associated with the design of the Advantage product.

91. Defendant's Advantage product was defective in design because, when it left Defendant's hands, it was unreasonably dangerous and was also more dangerous than the ordinary consumer would expect.

92. Under the TPLA, a product is "unreasonably dangerous" if it is dangerous to an extent beyond that contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics, or if because of its dangerous condition the product would not be put on the market by a reasonably prudent manufacturer or seller, assuming that the manufacturer or seller knew of its dangerous condition. Tenn. Code Ann. § 29-28-102(8).

93. At all relevant times, Defendant's Advantage product was in a defective condition, and was and is inherently dangerous and unsafe when used in the manner instructed and provided by Defendant.

94. At the time that the Advantage product was implanted into Plaintiff, it was being used for its intended use in a manner normally intended—namely, to treat stress urinary incontinence. Defendant had a duty to create a product, to wit, its Advantage device, that was not unreasonably dangerous for its normal, common, intended use.

95. Plaintiff, her physicians, and her other healthcare providers could not, by the exercise of reasonable care, have discovered the defects in this product or perceived their danger.

96. Defendant knew or should have known that its pelvic mesh products, including the Advantage product at issue in this case, unreasonably exposed patients to the risk of serious harm while conferring no benefit over available feasible alternatives that do not involve the same risks. At the time Defendant began marketing the Advantage, Defendant was aware that the Advantage was associated with each and every one of the adverse events communicated by FDA in its July 13, 2011, safety communication.

97. The Advantage was designed to be permanently implanted into a woman's body, yet the product changes after implantation; it contracts over time which can pull or compress nerves, muscles, and other soft tissues important for sexual function, mobility, bowel function, and bladder function. These product changes occur while the product is implanted.

98. To this day, the Advantage continues to be marketed to the medical community and to patients as a safe, effective, and reliable medical device, implanted by safe, effective, and

28

minimally invasive surgical techniques, and as safer and more effective as compared to available feasible alternative treatments of POP and SUI, and other competing products.

99. Defendant failed to design and establish a safe, effective procedure for removal of its pelvic mesh products, including the Advantage product at issue, or to determine if a safe, effective procedure for removal of the pelvic mesh products exists.

100. Feasible, suitable, and safer alternative designs to Defendant's Pelvic Mesh Products, including the Advantage product at issue, have existed at all times relevant and in reasonable probability would have prevented or significantly reduced the risk of Plaintiff's injuries without substantially impairing the product's utility. Said safer alternative designs were economically and technologically feasible at the time the Advantage product left the control of Defendant by the application of existing or reasonably achievable scientific knowledge. Said safer alternatives designs include, but are not limited to: (1) traditional abdominal surgery using sutures to attach the urethra to a ligament in the pelvis (known as the "Burch procedure"); (2) autologous fascia sling; (3) an allograft sling such as Repliform; (4) a retropubic sling; (5) a retropubic mini-sling, such as the TFS device made by TFS Surgical; (6) a sling with less polypropylene, such as Ultrapro; (7) a sling with a lighter-weight, larger pore mesh, such that used in the Ethicon Prolift+M; (8) a sling with a polymer-based polypropylene alternative, such as PVDF; and (9) a retropubic mini-sling comprised of the materials listed in (6)-(8).

101. The specific nature of defects for Defendant's Advantage device at issue in this case includes, but is not limited to, the following:

      a. The use of polypropylene material in the Advantage and the immune reaction that results from such material, causing adverse reactions and injuries;

29

b. The design of the Advantage to be inserted into and through an area of the body with high levels of bacteria that adhere to the mesh causing immune reactions and subsequent tissue breakdown and adverse reactions and injuries;

c. The design of the Advantage to be inserted into and through an area of the body that is blood vessel rich, nerve dense, and bacteria laden leading to excessive blood loss and vascular damage, permanent nerve injury and associated chronic, intractable neuropathic pain, contaminated permanently-implanted mesh causing chronic infections, subclinical infections and biofilms, enhanced chronic inflammatory response, chronic wound healing with tissue destruction, as well as numerous other adverse reactions and serious and permanent injuries;

d. Biomechanical issues with the design of the Advantage, including but not limited to, the propensity of the Advantage to contract or shrink in the body, that in turn causes surrounding tissue to be inflamed, become fibrotic, and contract, resulting in injury;

e. The propensity of the Advantage to migrate or to gradually elongate and deform when subject to prolonged tension inside the body;

f. The inelasticity of the Advantage, causing it to be improperly mated to the delicate and sensitive areas of the pelvis where it is implanted, and causing pain upon normal daily activities that involve movement in the pelvis;

g. The propensity of the Advantage for degradation and fragmentation over time, which causes a chronic inflammatory and fibrotic reaction, and results in continuing injury over time;

h. The propensity of the Advantage to cause long standing inflammatory response altering the effective porosity of the mesh resulting in poor outcomes including bridging fibrosis, compromise of tissues in contact with or surrounding the mesh, erosion, nerve damage and resulting neuromas;

i. The creation of a non-anatomic condition in the pelvis leading to chronic pain and functional disabilities when the mesh is implanted according to Defendants' instructions.

j. The inability of surgeons to effectively treat many of these conditions due to the integration of the mesh into the pelvic tissue and thus the inability to safely remove or excise the mesh once a complication occurs.

102. Defendant designed, developed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed a defective product—the Advantage product at issue in this case—that created an unreasonable risk to the health of consumers and to Plaintiff in particular and Defendant are therefore strictly liable for the injuries and damages sustained by Plaintiff.

103. The defects in Defendant's Advantage product were substantial and contributing factors in causing Plaintiff's injuries.

104. As a direct, foreseeable, and proximate result of Defendant's aforesaid acts and omissions, and as the direct, foreseeable, and proximate result of the implantation of Defendant's Advantage product into Plaintiff, Plaintiff was caused to suffer, did suffer, and will continue to suffer from physical emotional, economic and other injuries.

31

**WHEREFORE,** Plaintiff prays for judgment in her favor and against the Defendant for an amount in excess of $75,000 plus costs of suit and any further relief the Court deems equitable and just.

## COUNT IV: STRICT LIABILITY – MARKETING DEFECT (FAILURE TO WARN)

*(TPLA, Tenn. Code Ann. §§ 29-28-101, et seq., including Tenn. Code Ann. § 29-28-102(6); Tenn. Code Ann. § 29-28-105.)*

105.   Plaintiff incorporates each and every paragraph of this Complaint by reference as if fully stated herein.

106.   The Advantage product was manufactured, designed, marketed, labeled and sold in a defective condition, for use by the Plaintiff's physicians and/or healthcare providers and all other consumers of the product, making the product unreasonably dangerous.

107.   Defendant's pelvic mesh products, including the Advantage product at issue, as designed, manufactured, distributed, sold and/or supplied by Defendant, were defective as marketed due to inadequate warnings, instructions, labeling and/or inadequate testing in the presence of Defendant's knowledge of lack of safety.

108.   Defendant underreported and continue to underreport information about the propensity of their pelvic mesh products, including the Advantage product at issue, to fail and to cause injury and complications and have made unfounded representations regarding the efficacy and safety of its pelvic mesh products, including the Advantage product at issue, through various means and media.

32

109. Defendant failed to perform proper and adequate testing and research in order to determine and evaluate the nature, magnitude and frequency of the risks attendant to its pelvic mesh products, including the Advantage product at issue.

110. The Advantage product at issue was at all times utilized and implanted in a manner intended and/or foreseeable to Defendant, as Defendant generated the instructions for use, created the procedures for implanting the devices, and trained the implanting physician.

111. Defendant knowingly provided incomplete and insufficient training and information to physicians regarding the use of their pelvic mesh products, including the Advantage product at issue, and the aftercare of patients implanted with those pelvic mesh products.

112. At all relevant times, Defendant continued to promote its products as safe and effective even when no clinical trials had been done supporting long-term or short- term efficacy or safety.

113. In doing so, Defendant failed to disclose the known risks and failed to warn of known or scientifically knowable dangers and risks associated with its Pelvic Mesh Products, including the magnitude and frequency of these risks.

114. At all relevant times, Defendant failed to provide sufficient warnings and instructions that would have put Plaintiff, the medical community, Plaintiff's treating physicians, and the general public on notice of the dangers and adverse effects caused by implantation of the defendants' pelvic mesh products, including the Advantage product at issue.

115. The risk of serious injuries was known or should have been known to Defendant, but in spite of these risks, Defendant continued to market the Advantage for transvaginal use to physicians and patients, including Plaintiff and Plaintiff's healthcare providers, without adequate warnings.

116. In the Advantage IFU, as well as the marketing materials Defendant prepared and disseminated to patients and healthcare providers, Defendant omitted critical information regarding the risks and potential complications of the Advantage product at issue.

117. Specifically, Defendant failed to properly and adequately warn and instruct Plaintiff and her healthcare providers as to the following (subsequently referred to as the "Risks and Potential Complications"):

a. That the Advantage was not adequately studied prior to launch for safety and efficacy;

b. That the Advantage has propensities to contract, retract, and/or shrink inside the body;

c. That the Advantage has propensities for degradation, fragmentation, and/or creep;

d. That the Advantag's inelasticity prevents proper mating with the pelvic floor and vaginal region;

e. The magnitude of the risk of mesh erosion or extrusion;

f. The risk of chronic inflammation resulting from the Advantage;

g. The risk of chronic infections resulting from the Advantage;

h. The risk of developing chronic regional pain syndrome as a result of chronic inflammation/infection;

i. The risk of permanent vaginal or pelvic scarring as a result of the Advantage;

j.  The risk and/or magnitude of recurrent, intractable pelvic pain, nerve pain, and other pain resulting from the Advantage;

k.  The risk of secondary nerve irritation to the pudendal nerve;

l.  The risk of direct nerve injury to the obturator nerve;

m.  The risk of secondary nerve irritation to the obturator nerve;

n.  The magnitude of the risk of dyspareunia (painful sexual intercourse) in patients;

o.  That the Advantage may result in dyspareunia that makes vaginal penetration impossible;

p.  The risk of vulvar, perineal, or perianal allodynia;

q.  The frequency with which the need for corrective or revision surgery to adjust or remove the Advantage may occur in patients;

r.  The nature, magnitude, and frequency of the risk of acute and long-term complications that could occur as a result of implantation of the Advantage in patients;

s.  The hazards associated with the Advantage, including obturator and pudendal neuralgia and permanent nerve damage, and pelvic floor and groin myalgia;

t.  That treatment of SUI with the Advantage exposes patients to greater risk than feasible available devices for SUI, including pelvic mesh products utilizing alternative polypropylene material or non-polypropylene surgical products, alternatives, and procedures;

u. That treatment with the Advantage makes future surgical repair more difficult than feasible available alternatives;

v. That the Advantage offers no improvement in efficacy compared to non-mesh repairs and non-mesh repairs do not place the obturator or pudendal nerve at risk acutely or over time;

w. That use of the Advantage puts the patient at greater risk of requiring additional surgery than feasible available alternatives;

x. That removal of the Advantage due to complications may significantly impair the patient's quality of life;

y. That complete removal of the Advantage may not be possible;

z. That complete removal of the Advantage may not result in complete resolution of the complications, including pain;

aa. The foreseeable and unavoidable risk of acute obturator or pudendal neuralgia or obturator and/or pudendal neuralgia occurring months or years after implantation;

bb. The magnitude of the risk of obturator and/or pudendal neuralgia; and

cc. The risk of permanent injury and pain to the muscles and soft tissues of the pelvic floor that may occur acutely after implantation or become symptomatic months or years after implantation.

118. Defendant failed to properly and adequately warn and instruct Plaintiff and her healthcare providers as to the proper candidates for, and the safest and most effective methods of, implantation and use of Defendant's pelvic mesh products, including the Advantage at issue in this case.

Defendant also failed to properly and adequately warn and instruct Plaintiff and her healthcare providers with regard to the inadequate research and testing of the pelvic mesh products, including the Advantage at issue in this case, and the complete lack of a safe, effective procedure for removal of the pelvic mesh products.

119. The Advantage device at issue was expected to, and did, reach the intended consumers, handlers, and persons receiving the products, including Plaintiff, with no substantial change in the condition in which the products were designed, produced, manufactured, sold, distributed, labeled and marketed by Defendant.

120. Defendant, by exercising reasonable diligence, could have made such warnings available to Plaintiff, Plaintiff's healthcare providers, and the medical community.

121. The Advantage is a prescription medical device and was marketed, labeled, and supplied for use only by physicians and other healthcare providers. Defendant's duty to warn and instruct therefore includes a duty to provide adequate warnings and instructions to the implanting physician and other healthcare providers who act as learned intermediaries.

122. Had Defendant provided adequate and complete warnings and instructions regarding the nature, magnitude, and frequency of the risks and potential complications associated with the Advantage, Plaintiff's implanting physician would not have recommended or implanted the Advantage, would have selected a feasible alternative treatment or design, and/or would have materially altered the procedure and post-operative management so as to avoid or substantially reduce Plaintiff's injuries.

123. As a direct and proximate result of Defendant's failure to provide Plaintiff, Plaintiff's healthcare providers, and the medical community with sufficient or adequate warnings, Plaintiff

and Plaintiff's healthcare providers were not adequately informed of the potential dangers and/or defects of the Advantage at issue.

124. Defendant's failure to adequately warn about the risks and dangers associated with the Advantage at issue was a proximate cause of the damages and injuries to Plaintiff. Thus, Defendant is strictly liable to Plaintiff.

125. As a direct, foreseeable, and proximate result of Defendant's acts and omissions, and as the direct, foreseeable, and proximate result of the implantation of Defendant's Advantage product into Plaintiff, Plaintiff was caused to suffer, did suffer, and will continue to suffer from physical, emotional, economic and other injuries.

**WHEREFORE,** Plaintiff prays for judgment in her favor and against the Defendants for an amount in excess of $75,000 plus costs of suit and any further relief the Court deems equitable and just.

**COUNT V: BREACH OF EXPRESS WARRANTIES**

*(TPLA, Tenn. Code Ann. § 29-28-102(6); Tenn. Code Ann. §§ 47-2-313 and 47-2-607.)*

126. Plaintiff incorporates each and every paragraph of this Complaint by reference as if fully stated herein.

127. The statements, affirmations of fact, and promises described herein constitute express warranties under Tenn. Code Ann. § 47-2-313.

128. Plaintiff was the intended and foreseeable user and beneficiary of Defendant's express warranties and representations regarding the Advantage. To the extent privity is required for any warranty-based recovery, Plaintiff pleads that she is an intended third-party beneficiary of

Defendant's warranties and that Defendant's warranties were made for the purpose of influencing the decision to select and implant the Advantage in Plaintiff.

129. Plaintiff provided notice of breach to Defendant within a reasonable time after discovery of the breach, or such notice is excused under the circumstances. Tenn. Code Ann. § 47-2-607.

130. Defendant expressly warranted that its Advantage device was safe and fit for use by consumers, was of merchantable quality, did not produce dangerous side effects, and was adequately tested and fit for its intended purpose.

131. At the time of Defendant's express warranties, Defendant knew or should have known, that its Advantage device did not conform to these express warranties because its Advantage device was not safe and had numerous serious side effects, about which Defendants did not adequately warn.

132. As a direct, foreseeable, and proximate result of Defendant's breach of their express warranties, Plaintiff suffered and will continue to suffer severe and permanent personal injuries, harm, and economic loss.

133. Plaintiff relied on Defendant's express warranties with respect to its pelvic mesh products, including the Advantage device.

134. Members of the medical community, including Plaintiff's physicians and other healthcare providers, relied upon Defendant's representations and warranties in connection with the use, recommendation, description, and implantation of the Advantage device.

135. Defendant breached the express warranties because its Advantage device was, and is, defective and unreasonably unsafe for its intended use.

136. Defendant expressly represented to Plaintiff, her physicians and her other healthcare providers that their Advantage device: (i) was safe and fit for the purposes intended, (ii) was of merchantable quality, (iii) did not produce any dangerous side effects in excess of those risks associated with other treatments for pelvic organ prolapse and stress urinary incontinence, (iv) the side effects it produced were accurately reflected in the warnings, and (v) it was adequately tested and fit for its intended use.

137. Defendant knew, or should have known, that its representations and warranties were false, misleading, and untrue because the Advantage device was not safe and fit for its intended use and caused its users serious injuries of which Defendant did not adequately warn.

138. As a direct, foreseeable and proximate result of Defendant's foregoing acts and omissions, Plaintiff was caused to suffer and did suffer serious and grievous personal injuries, including dyspareunia, pelvic pain, vaginal pain, pudendal neuralgia, and recurring urinary tract infections, permanent and substantial physical deformity, and the loss of the ability to perform sexually, as well as other grievous personal injuries, including, but not limited to, physical pain and mental anguish, permanently diminished enjoyment of life, and any and all additional life implications and complications, such as Plaintiff's need for life-long medical treatment and medical monitoring, and perpetual fear of developing additional adverse health consequences.

139. As a direct, foreseeable and proximate result of Defendant's foregoing conduct, Plaintiff has suffered and will continue to suffer serious and permanent physical and emotional injuries, has incurred medical expenses, has suffered and will continue to suffer economic loss, and has otherwise been physically, emotionally, and economically injured.

**WHEREFORE,** Plaintiff prays for judgment in her favor and against the Defendants for an amount in excess of $75,000 plus costs of suit and any further relief the Court deems equitable and just.

## COUNT VI: STRICT LIABILITY – MANUFACTURING DEFECT

*(TPLA, Tenn. Code Ann. §§ 29-28-101, et seq.; Tenn. Code Ann. § 29-28-105.)*

140. Plaintiff incorporates each and every paragraph of this Complaint by reference as if fully stated herein.

141. The Advantage device implanted in Plaintiff was not reasonably safe for its intended use and was defective, as described herein, as a matter of law with respect to its manufacture in that the Advantage device deviated materially from the Defendant's design and manufacturing specifications in such a manner as to pose unreasonable risks of serious bodily harm to Plaintiff.

142. The Defendant's Advantage device is inherently dangerous and defective, unfit and unsafe for its intended and reasonably foreseeable use, and does not meet or perform to the expectations of patients, including Plaintiff, and their healthcare providers, including Plaintiff's implanting surgeon.

143. The Advantage device creates risks to the health and safety of the patients, including Plaintiff, that are far more significant and devastating than the risks posed by other products and procedures available to treat the corresponding medical conditions and which far outweigh the utility of the Advantage device.

144. The device as manufactured did not perform as intended.

145. The device was defective when it left the Defendants' control as a result of a flaw in the manufacturing process, workmanship, and/or materials of which the product was made.

41

146. As a direct, foreseeable and proximate result of Defendants' foregoing conduct, Plaintiff has suffered and will continue to suffer serious and permanent physical and emotional injuries, has incurred medical expenses, has suffered and will continue to suffer economic loss, and has otherwise been physically, emotionally, and economically injured.

**WHEREFORE,** Plaintiff prays for judgment in her favor and against the Defendants for an amount in excess of $75,000 plus costs of suit and any further relief the Court deems equitable and just.

## COUNT VII: BREACH OF IMPLIED WARRANTY OF FITNESS AND MERCHANTABILITY

*(TPLA, Tenn. Code Ann. § 29-28-102(6); Tenn. Code Ann. §§ 47-2-314, 47-2-315, and 47-2-607.)*

147. Plaintiff incorporates each and every paragraph of this Complaint by reference as if fully stated herein.

148. Defendant, as a merchant with respect to medical devices such as the Advantage, impliedly warranted that the Advantage was merchantable and fit for the ordinary purposes for which such goods are used. Tenn. Code Ann. § 47-2-314.

149. Defendant further impliedly warranted that the Advantage was fit for the particular purpose for which it was sold and supplied, namely, treatment of SUI, because Defendant had reason to know the particular purpose and that Plaintiff and her healthcare providers would rely upon Defendant's skill and judgment to furnish a suitable product. Tenn. Code Ann. § 47-2-315.

150. Plaintiff provided notice of breach to Defendant within a reasonable time after discovery of the breach, or such notice is excused under the circumstances. Tenn. Code Ann. § 47-2-607.

151. Defendant knew, or had reason to know, that the Advantage was dangerous for the use for which it was sold.

152. Defendant had no reason to believe that Plaintiff, or her healthcare providers, would recognize, understand, or anticipate the true nature and extent of the risks and defects associated with the Advantage, including its propensity to contract, retract, shrink, degrade, erode/expose, and cause chronic pain and other complications during its ordinary and intended use, about which Defendant did not adequately warn.

153. Plaintiff and her healthcare providers relied on Defendant's skill and judgment in manufacturing and selling Pelvic Mesh Products, including the Advantage, that were suitable and fit for their intended purposes.

154. The Advantage was implanted and used in the manner in which Defendant intended and instructed, and such use was foreseeable to Defendant.

155. The Advantage was unfit for the particular purpose for which it was sold, namely, as a treatment for SUI.

156. As a direct, foreseeable and proximate result of Defendants' foregoing conduct, Plaintiff has suffered and will continue to suffer serious and permanent physical and emotional injuries, has incurred medical expenses, has suffered and will continue to suffer economic loss, and has otherwise been physically, emotionally, and economically injured.

**WHEREFORE,** Plaintiff prays for judgment in her favor and against the Defendants for an amount in excess of $75,000 plus costs of suit and any further relief the Court deems equitable and just.

## COUNT VIII: MISREPRESENTATION, CONCEALMENT, AND/OR NONDISCLOSURE

*(TPLA, Tenn. Code Ann. §§ 29-28-101, et seq., including Tenn. Code Ann. § 29-28-102(6).)*

157. Plaintiff incorporates each and every paragraph of this Complaint by reference as if fully stated herein.

158. This is a product liability action governed by the TPLA, which expressly includes claims based on "misrepresentation, concealment, or nondisclosure, whether negligent or innocent." Tenn. Code Ann. § 29-28-102(6).

159. At all relevant times, Defendant, through its labeling, Instructions for Use ("IFU"), marketing materials, sales representatives, and other communications, made affirmative representations and omissions concerning the safety, efficacy, and risk profile of the Advantage and the material risks and complications associated with implantation, chronic implantation, and attempted removal.

160. Defendant misrepresented and/or concealed material information concerning, among other things, the nature, magnitude, frequency, and severity of the risks and potential complications associated with the Advantage, including chronic pain, nerve injury, erosion/exposure, contraction/shrinkage, inflammation, scarring, and the inability to fully remove the mesh once implanted.

44

161. Defendant knew, or in the exercise of reasonable care should have known, that these representations were false and/or misleading, and that the omitted information was material to physicians' and patients' decisions regarding treatment options for SUI.

162. Defendant intended, and/or reasonably should have expected, that Plaintiff and Plaintiff's healthcare providers would rely on Defendant's representations and omissions in deciding whether to select, recommend, and implant the Advantage, and in managing Plaintiff's care.

163. Plaintiff and/or her implanting physician did, in fact, rely on Defendant's representations and omissions, and the Advantage was implanted into Plaintiff as a result.

164. Had Defendant truthfully and fully disclosed the material risks and the true safety profile of the Advantage, Plaintiff's implanting physician would not have recommended or implanted the Advantage, would have selected a feasible alternative, and/or would have altered the procedure and post-operative management to avoid or substantially reduce Plaintiff's injuries.

165. Defendant's misrepresentations, concealment, and nondisclosures were negligent, reckless, and/or intentional, and were a direct and proximate cause of Plaintiff's injuries and damages as alleged herein.

**WHEREFORE,** Plaintiff prays for judgment in her favor and against the Defendants for an amount in excess of $75,000 plus costs of suit and any further relief the Court deems equitable and just.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff demands judgment against Defendants for damages in excess of $75,000, for:

45

(A) Compensatory damages for pain and suffering;

(B) Economic damages, including but not limited to past and future medical expenses;

(C) Punitive damages, to the extent permitted by Tennessee law, including Tenn. Code Ann. § 29-39-104;

(D) Prejudgment and/or post-judgment interest;

(E) Attorneys' fees and costs, where permitted by law; and

(F) All other equitable and legal relief to which this Court finds proper.

## DEMAND FOR JURY TRIAL

Plaintiff, by and through counsel, demands a trial by jury.

Dated: December 30, 2025

Respectfully submitted,

 /s/ *Andrew LeClair*

Andrew LeClair, Esq.
Massachusetts Bar ID No. 688040
Ketterer Browne & Associates
336 S. Main Street
Bel Air, MD 21014
Ph: 855-522-5297
Fax: 850-801-3190
andy@kbaattorneys.com

/s/ *Robert E. Price*
Robert E. Price
(*Pro Hac Vice to be filed*)
Florida Bar No. 85284
Ketterer Browne & Associates
4300 Bayou Blvd., Ste. 16 Fl. 2
Pensacola, FL 32503
Ph: 855-522-5297
Fax: 850-801-3190
robert@kbaattorneys.com

*/s/ Angela L. Trawick*
Angela L. Trawick
*(Pro Hac Vice to be filed)*
Florida Bar No. 112236
Ketterer Browne & Associates
4300 Bayou Blvd., Ste. 16 Fl. 2
Pensacola, FL 32503
Ph: 855-522-5297
Fax: 850-801-3190
angelatrawick@kbaattorneys.com

*Counsel for Plaintiff*